UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 11-cr-00336-MSK

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JULIAN F. HAWKINS,

        Defendant.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO SUPPLEMENT RECORD AND RECONSIDER SUPPRESSION RULING**

---

**THIS MATTER** comes before the Court pursuant to Mr. Hawkins' Motion to Supplement/Motion for Reconsideration **(# 40)** and Motion Requesting Evidentiary Hearing **(#57)**, and the Government's response **(# 48)**; and Mr. Hawkins' Motion for Clarification **(# 67)**.

## FACTS

A. <u>Background</u>

Some explanation of the unusual procedural posture of this action is warranted. Mr. Hawkins is charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The weapon was allegedly discovered through a search occurring during a routine traffic stop of Mr. Hawkins' vehicle. Mr. Hawkins' original attorney moved **(# 19)** to suppress the fruits of the traffic stop and search, and on December 27, 2011, the Court conducted an evidentiary suppression hearing **(# 34)**. At the conclusion of that hearing, the Court denied the motion to suppress.

1

A few days later, although still represented by counsel, Mr. Hawkins filed a *pro se* motion **(# 40)** requesting that he be permitted to supplement the record of the suppression hearing and that the Court then reconsider the issue of suppression in light of the supplemental material. The Court directed the Government to file a response, and the Government did so **(# 48)**.

A few days later, Mr. Hawkins moved to have his counsel withdraw. His counsel joined in that request, and on January 17, 2012, the Court directed that new counsel be appointed to represent Mr. Hawkins.

On January 25, 2012, Mr. Hawkins filed a *pro se* motion requesting an evidentiary hearing **(# 57)** on his previous motion to supplement and for reconsideration, largely repeating the arguments raised in his earlier motion. The Court then directed **(# 58)** Mr. Hawkins' newly-appearing counsel to review Mr. Hawkins' *pro se* motions and either "adopt, adopt with modification, or abandon" those motions. Counsel subsequently adopted **(# 62)** the *pro se* motions, elaborating on some arguments raised therein and standing on the motions as filed in other respects.[1]

B. Suppression hearing

Because Mr. Hawkins' arguments are informed by the evidence that was received at the suppression hearing, the Court takes this opportunity to summarize that evidence. On July 14,

---

[1] The Court then directed **(# 63)** the Government to file a response to Mr. Hawkins' motion requesting an evidentiary hearing, and the Government responded by standing on its prior response to Mr. Hawkins' motion to supplement. Mr. Hawkins, through counsel, simultaneously filed a request for an extension of time to respond to whatever opposition the Government might articulate to the request for an evidentiary hearing, but in light of the Government's decision not to file any further response, Mr. Hawkins' motion for an extension of time was largely rendered moot.

2011, Sergeant Steven Noeller of the Pueblo Police Department was stopped at the intersection of Elizabeth Street and Highway 50 West. Across the intersection, he observed two vehicles, a maroon Cadillac and a silver Cadillac, both preparing to turn left. When the traffic light changed, the silver Cadillac "accelerated very fast to the point where the tires started squealing like it was – I don't know doing like a burn out, I guess." Sergeant Noeller stated that "it turned into the turn lane and as it completed that turn, the back end of the vehicle fishtailed into the [adjacent] lane and then came back around – it kind of fishtailed back and forth in smaller gyrations until they gained control of the vehicle and continued traveling southbound on Elizabeth." Believing that the driver of the silver Cadillac should be ticketed for careless driving, Sergeant Noeller made a U-turn and pursued the vehicle. As Sergeant Noeller came close to the silver Cadillac and prepared to activate his emergency lights, the maroon Cadillac "cut me off" in a way that caused him to believe that it "was trying to prevent me from getting behind [the silver Cadillac] to pull it over." Based on Sergeant Noeller's training and experience, he believed this maneuver was consistent with a drug trafficking practice involving a "chase car" that attempts to intercept and distract police officers preparing to pull over a vehicle loaded with drugs. The Cadillacs then made a left turn and Sergeant Noeller followed, managing to place his vehicle between the two Cadillacs. By that point, the silver Cadillac had pulled into a nearby parking lot, and Sergeant Noeller then activated his emergency lights and the silver Cadillac came to a stop. The maroon Cadillac continued down the street.

      Sergeant Noeller radioed in information about the silver Cadillac, and at that time, a second Pueblo Police Officer who had been stopped in the parking lot came by. Sergeant Noeller approached the driver's side of the Cadillac and observed the driver reaching into the

glove compartment. He shined his flashlight into that area to ensure that the glove compartment did not contain a weapon, and noticed what he believed to be a black .38 revolver with a silver cylinder on the passenger side floorboard. Sergeant Noeller opened the driver's side door and asked the driver to step out of the vehicle. The driver – later identified as Mr. Hawkins – did so, and Sergeant Noeller patted him down to determine whether he possessed any additional weapons. During the pat-down, Sergeant Noeller felt what he believed to be the grip of another weapon in Mr. Hawkins' back right pants pocket. Sergeant Noeller and the second police officer on the scene restrained Mr. Hawkins, and, having done so, recovered an unloaded handgun from his back right pocket and a second, loaded weapon in his waistband After[2] ascertaining that Mr. Hawkins was under a restraining order and prohibited from possessing a weapon, the officers placed Mr. Hawkins in a patrol car and proceeded to search the interior of his vehicle. (Mr. Hawkins did not consent to this search, but Sergeant Noeller believed that his sighting of the weapon on the floorboard, coupled with the knowledge that Mr. Hawkins was prohibited from possessing a weapon, provided probable cause to effect the search of the vehicle.) That search revealed ammunition for several different weapons in the center console of the vehicle and in the glove compartment, and five weapons in a case in the trunk of the car. The search also disclosed that the weapon spotted by Sergeant Noeller on the floorboard was, in actuality, a toy gun.

      The defense then called Mr. Hawkins to the stand. He testified that he was following a friend to her home when he reached the intersection at Elizabeth Street. He denied that he squealed his tires or abruptly turned left, stating that he "proceeded smoothly through the

---

[2]On cross-examination, Sergeant Noeller stated that he was not certain whether he obtained information about Mr. Hawkins' restrictions before or after he was placed in the patrol car.

intersection." Mr. Hawkins was specifically asked by his counsel whether his car fishtailed, to which he responded "No, it's impossible." Pressed to explain, he stated

> My '99 Cadillac . . . is a front wheel drive . . . which means that the front wheels are actually not only used for traction of the vehicle, they're actually used for steering so at any time the front wheels lose traction you also lose the ability to steer the car so anybody who knows you can't do doughnuts, you cannot fishtail in a front wheel drive vehicle. If you go around the corner too strong already or if you go around the corner and you step on the gas too strongly in a front wheel drive vehicle what happens is you lose traction and also the ability to steer the car. It continues in a straight line. It's called inertia.

Mr. Hawkins explained that once he became aware that the police car was going to pull him over, he pulled into the parking lot so that, if he was going to be arrested on an outstanding warrant, his vehicle would not have to be towed off the street. Mr. Hawkins testified that Sergeant Noeller asked him "where's the fire," which Mr. Hawkins understood to imply that "he thought I was trying to get away from him quickly." Mr. Hawkins contends that he does not remember a toy gun being on his floorboard and that he cleans his car out on a regular basis and would have known if the toy gun had been there.

Based on this record, the Court found that Sergeant Noeller's testimony was more persuasive, that the circumstances he described regarding the silver Cadillac's left turn constituted reasonable suspicion to effect a traffic stop, and that Sergeant Noeller's observation of the gun on the floorboard was a sufficient basis to effect the pat-down search of Mr. Hawkins that revealed the weapons giving rise to the instant charge.

C. <u>Mr. Hawkins' motions</u>

Mr. Hawkins first seeks **(# 40)** leave to re-open the record of the suppression hearing to offer four pieces of supplemental evidence, and requests reconsideration of the ruling in light of

that supplemental evidence. Those items of evidence are:

    1. A printout of a U.S. Department of Energy, Office of Science web page entitled "Ask a Scientist," in which a person identified as a Professor of Physics at Rutgers University responds to a question about "what handles better in winter, a vehicle with rear-wheel drive or front-wheel drive?," to which the person responds, among other things, that "my opinion is that ... front-wheel drive [has] better traction in accelerating" but that "it has a severe disadvantage in going around corners," as "if you step on the gas too strongly while going around a corner, the wheels can lose traction," while in a rear-wheel drive car "if you spin the wheels while going around a curve . . . the rear wheels will slide towards the outer edge of the curve [but] this can be countered by straightening the steering wheel or even turning to the right on a left turn." The person states that he has "checked this many times, often by 'fishtailing' down a straight slippery road [and] I find it easy to control . . . on a rear wheel drive car but extremely dangerous on a front wheel drive car."

    2. Two letters, dated late October and early November 2011, addressed to the Defendant from two Chevrolet dealers. Copies of the letters in the Court's electronic case file are somewhat obscured by overlap from copies of the envelopes that accompany them, but the legible portions of both letters appear to address the issue of the operation of a vehicle's traction control system and appear to opine that it would be difficult, if not impossible "to accelerate [in a way] that would cause the rear end of the vehicle to swing back and forth."

    3. Two photographs, described by the Defendant only as "inventory search photos by Det. Maize," but which are impossible to ascertain in the context in which they have been scanned.

    4. A case citation to *State of Indiana v. Puluti*, 899 N.E.2d 759 (In.App. 2008), an unpublished decision. In *Puluti*, the state appealed an order by the trial court granting the defendant's motion to suppress the fruits of a traffic stop. The trial court credited the defendant's testimony that she accelerated smoothly from a stop, without spinning her tires and fishtailing her car, over testimony from police officers to the contrary. Finding that the appeals court was not permitted to revisit the trial court's credibility determinations, the appeals court affirmed the granting of the motion to suppress.

From these items of evidence, Mr. Hawkins offers five arguments for reconsideration: (i) the supplemental evidence discredits Sergeant Noeller's testimony that Mr. Hawkins "fishtailed" while making the left turn; (ii) an argument that appears to contend that "at [the] moment" that Sergeant Noeller ordered Mr. Hawkins out of the vehicle, he "lacked reasonable suspicion that a crime had or was being committed in its presence" to effect an arrest, that "there was no mention in Sergeant Noeller's initial report that a toy gun was discovered or recovered" from the vehicle, and that "Det. Maize reported that Sgt. Noeller told him that he had seen this toy gun on the driver's side floorboard; (iii) that it was "only after [he] was placed under arrest and taken into custody was it discovered that [he] had an outstanding restraining order" that prohibited him from possessing weapons, and thus, any evidence procured [by a] search incident to arrest cannot be used [in] hindsight as the reason for the arrest"; (iv) a somewhat unclear argument that concedes that a police officer may search the interior of a vehicle when effecting an arrest, but such a search cannot be conducted when the suspect has been secured and cannot access the vehicle, but contends that no search of a vehicle may be conducted "due to a recent occupant's <u>unlawful</u> arrest" (emphasis in original), which the Court understands to be Mr. Hawkins' contention that his arrest was unlawful *ab initio*, and thus, any search of his person or his vehicle by Sergeant Noeller was not permitted; and (v) a somewhat unclear argument, relying on certain photos, that "Det. Maize searched and obtained evidence from the wrong vehicle," apparently because no toy gun was recovered from the vehicle.

Thereafter, Mr. Hawkins filed a *pro se* Motion Requesting Evidentiary Hearing **(# 57)**. That motion argues: (i) his motion for reconsideration makes a "strong preliminary showing . . . casting a shadow of doubt on the credibility in contrast to Sgt. Noeller's testimony at the

suppression hearing," thus warranting an evidentiary hearing on that motion; (ii) repeats his argument that it is impossible for his vehicle to have "fishtailed" in the way described by Sergeant Noeller; (iii) explains that "discovery revealed" photographs and search inventories from a post-arrest search by Detective Maize of a vehicle that is not Mr. Hawkins', which he contends is "further proof that Pueblo Police Officers were at best mistaken or at worst lying"; and (iv) indicates that Mr. Hawkins "desires to present evidence from a witness that was not available at the first suppression hearing," namely testimony from an unidentified "Automotive Engineer Forensic Expert who will testify before the court concerning physics, automotive dynamics, and characteristics of both front and rear wheel drive to help the Court determine the facts of this case."

As previously noted, Mr. Hawkins' original counsel withdrew and his new counsel purported to adopt the above-referenced *pro se* motions. In a Motion to Adopt **(# 62)**, Mr. Hawkins' counsel primarily summarized and clarified certain arguments made by Mr. Hawkins in his *pro se* motions, but does not offer any significant new arguments or evidence not previously identified by Mr. Hawkins. Counsel's motion does draw the Court's attention to one additional facet of Mr. Hawkins' contentions: that his prior counsel provided ineffective assistance to Mr. Hawkins during the suppression hearing. Drawing from allegations made in Mr. Hawkins' motion seeking his prior counsel's withdrawal, the Motion to Adopt points out that Mr. Hawkins has alleged: (i) his prior counsel was "ill-prepared" to conduct the suppression hearing, insofar as counsel had only contacted him once, four days prior to the hearing; and that Mr. Hawkins spoke with his co-counsel during the hearing to request that counsel ask certain additional questions during cross-examination, but that counsel told him that counsel would

address those questions on "re-cross examination," only to later discover that no such re-cross examination would be permitted[3]; (ii) that his prior counsel filed a Notice of Disposition without first obtaining Mr. Hawkins' consent; and (iii) that counsel failed to investigate the issue relating to the front-wheel drive character of his vehicle, that counsel was not in adequate communication with him.

## ANALYSIS

### A. Standard of review

The Federal Rules of Criminal Procedure do not formally recognize a means for obtaining reconsideration of a prior ruling, but the courts possess inherent power to revisit their own rulings as circumstances require. *U.S. v. Coughlin*, ___ F.Supp.2d ___, 2011 WL 2623494 (D.D.C. Jul. 6, 2011) (slip op.)  In doing so, courts typically apply the same standard of review called for by Fed. R. Civ. P. 59(e) or 60(b). *Id.* Regardless of which rule applies, such motions are appropriate where there has been an intervening change in the controlling law, the discovery of evidence that was not available at the time of the earlier decision, or a need to correct manifest injustice. *U.S. v. Zamora-Solorzano*, 387 Fed.Appx. 848, 850 (10th Cir. 2010).

### B. Evidence regarding "fishtailing"

The Court turns first to the question of whether there is "newly-discovered evidence" warranting reopening of the hearing. In doing so, the Court focuses on the items attached by Mr. Hawkins to his Motion to Supplement relating to the question of whether it was possible for his

---

[3] The Court notes that Mr. Hawkins' prior counsel did not request an opportunity to conduct any re-cross examination during the suppression hearing.

car to "fishtail."[4]

At the outset, the Court notes that none of the items is "newly-discovered" in the sense that the evidence was unknown to Mr. Hawkins at the time of the suppression hearing and could not have been discovered by him through due diligence. *U.S. v. Pickard*, 278 F.Supp.2d 1210, 1212 (D.Kan. 2003). The letters from the auto dealers are addressed directly to Mr. Hawkins and are dated or postmarked in October and November 2011, and thus, Mr. Hawkins presumably knew of their existence well prior to the suppression hearing that was held on December 27, 2011. The webpage printout appears to bear the date of November 17, 2011, indicating that it, too, was available to Mr. Hawkins at the time of the suppression hearing.

Moreover, even if the Court could somehow characterize this evidence as "newly-discovered," it would nevertheless decline to reopen the suppression hearing record to consider it because the evidence is redundant and cumulative of evidence already in the record. *See Dronsejko v. Thornton*, 632 F.3d 658, 670 (10th Cir. 2011) (relief from order based on newly-discovered evidence requires showing that the evidence is "not merely cumulative or impeaching"). As quoted above, Mr. Hawkins testified at length in the suppression hearing about the impossibility of his front-wheel drive Cadillac "fishtailing" in the way described by Sergeant Noeller. The tendered letters and webpage printout do nothing more the repeat the principles already addressed in Mr. Hawkins' own testimony. As such, they are not a proper basis for reconsidering the suppression ruling, even if they are considered "newly-discovered."

Finally, the Court notes that, even if it were to reopen the suppression hearing record to

---

[4] The Court puts aside, for the moment, the fact that the evidence tendered by Mr. Hawkins is hearsay for which no apparent exception would apply.

receive the letters and reconsider its ruling accordingly, the Court would nevertheless come to the same conclusion. Mr. Hawkins' motion dwells on Sergeant Noeller's use of the term "fishtailing," but the Court did not understand Sergeant Noeller to be attempting to use that term in a precise or technical way; rather, the Court understood Sergeant Noeller to be using the term as a shorthand way of expressing the fact that Mr. Hawkins' car was accelerating through the left turn in such a way that it was not under the driver's complete control. Sergeant Noeller testified that he saw "the tail end of the car" move into the adjacent lane, but on cross-examination, he stated that the vehicle "was kind of beside me when it did this," suggesting that Sergeant Noeller may have been focusing his attention on movement at the back of the vehicle without necessarily observing whether the front of the vehicle was losing control as well. In this regard, the webpage printout submitted by Mr. Hawkins is illustrative: it explains that, in front-wheel drive vehicles, "if you step on the gas too strongly while going around a corner" – precisely what Sergeant Noeller contends Mr. Hawkins did here – "the wheels can lose traction as they spin and will lose all ability to steer the car."[5] What Sergeant Noeller may have perceived as the back of Mr. Hawkins' vehicle "fishtailing" might very well have been Mr. Hawkins struggling to maintain control of the vehicle as a whole.

Moreover, Mr. Hawkins' argument on this point fails to account for a more fundamental fact: the Court found Sergeant Noeller's testimony that Mr. Hawkins rounded the corner carelessly to be more credible than Mr. Hawkins' testimony that he rounded the corner smoothly.

---

[5]The letters from the auto dealers are not to the contrary. For example, the letter from mr. Schauer posits that a loss of traction is unusual "with normal acceleration" and that fishtailing will rarely result "under normal driving conditions," but does not appear to contemplate whether traction could be lost in part or whole when a driver abruptly accelerates through a turn.

Certainly, there was evidence supporting an inference that Mr. Hawkins accelerated through the turn at an unusually high rate of speed: Mr. Hawkins (not Sergeant Noeller) testified that Sergeant Noeller's first words to him were "where's the fire?," a question consistent with a set of facts in which Mr. Hawkins was driving at an unusually fast speed. This tends to support Sergeant Noeller's version of events, and not Mr. Hawkins'. In addition, Mr. Hawkins offered no plausible alternative explanation for why Sergeant Noeller would have decided to alter his course and pursue Mr. Hawkins. Mr. Hawkins speculates that Sergeant Noeller pulled him over for no reason, and then, once a basis for arresting Mr. Hawkins was discovered, Sergeant Noeller retroactively fabricated the left turn story to provide an initial justification for the stop. This theory is facially implausible because of the "where's the fire" comment; such a comment suggests that Sergeant Noeller already considered Mr. Hawkins to have been driving at a high speed even before any weapons were discovered. Thus, even if Sergeant Noeller was somewhat mistaken in his perception as to Mr. Hawkins' vehicle "fishtailing," the record as a whole indicates that Sergeant Noeller credibly perceived Mr. Hawkins to be accelerating at a high rate of speed, squealing his tires, and possibly swerving into the adjacent traffic lane. In such circumstances, the Court finds that, even in light of the supplemental submissions by Mr. Hawkins, Sergeant Noeller had articulated a sufficiently objective and reasonable suspicion that Mr. Hawkins was engaging in careless driving, sufficient to permit the ensuing traffic stop.

### C. Search by Detective Maize

The other "newly-discovered evidence" that Mr. Hawkins relies upon concern material relating to a search of Mr. Hawkins' vehicle by a Detective Maize, apparently conducted several days after the arrest. The contours of this argument are somewhat unclear, as there was no

12

evidence offered at the suppression hearing about this search.  Mr. Hawkins contends that the newly-tendered evidence relating to Detective Maize's search shows that "Det. Maize searched and obtained evidence from the wrong vehicle," and that "there is no evidence that a toy gun was ever found or recovered from Defendant or his vehicle."  Mr. Hawkins' counsel's Motion to Adopt offers only slightly more clarification on this point, arguing that "Detective Maize . . . appears to have searched the wrong vehicle which would strongly suggest that there was never a toy gun seen or found in Mr. Hawkins' vehicle which was used by Sergeant Noeller as the basis for ordering Mr. Hawkins out of his vehicle."

The Court is simply unable to follow this argument in any meaningful way.  It is entirely unclear to the Court whether Mr. Hawkins is asserting that Detective Maize did, as a matter of fact, search the wrong car believing it to be Mr. Hawkins, or whether Mr. Hawkins is merely expressing uncertainty, based on ambiguities in the discovery, as to whether Detective Maize might have searched the right vehicle or not.  Assuming Mr. Hawkins is contending that Detective Maize did, in fact, search the wrong vehicle, it is unclear to the Court how this fact has any probative value (except, perhaps, to demonstrate in some vague way that the Pueblo Police Department is careless).  Certainly, a search of a car <u>other</u> than Mr. Hawkins will not have turned up the toy gun that was allegedly in Mr. Hawkins' car.

Ultimately, the entire issue is irrelevant to the issues presented in the suppression hearing, even on the record as supplemented by Mr. Hawkins.  Detective Maize did not testify, and no evidence reflecting the fruits of that search were before the Court in ruling on the suppression question.  Thus, the question of what Detective Maize might or might not have done had (and on the present record, cannot have) no impact on the suppression ruling.  In requesting

to reopen the suppression hearing record, Mr. Hawkins (and his counsel) have not professed an intention to call Detective Maize to testify (nor have they offered any justification for not having called him at the initial hearing). Thus, the fragmentary material tendered by Mr. Hawkins is not, of itself, sufficient to demonstrate that reconsideration of the suppression ruling would in any way lead to a different result.

As best the Court can determine, what Mr. Hawkins is actually attempting to do with Detective Maize is to impeach Sergeant Noeller's testimony that he saw a weapon on the passenger side floorboard of Mr. Hawkins' car. The argument, as the Court could envision it, goes something like this: if Detective Maize inventoried the correct vehicle, and if that inventory did not include a reference to the toy gun, then there is reason to believe that the toy gun was not present in the vehicle and thus, Sergeant Noeller's testimony that he saw the toy gun is not credible. But the very premise of this argument – that Detective Maize inventoried the correct vehicle – is inconsistent with what Mr. Hawkins is contending in his motions. To the extent the argument in those motions is clear, the argument is that "Detective Maize . . . appears to have searched the wrong vehicle." Accordingly, nothing in this argument warrants reconsideration of the suppression ruling.

### D. Ineffective assistance

In adopting Mr. Hawkins' *pro se* motions, his counsel appears to urge the Court to reconsider the suppression ruling on the grounds that Mr. Hawkins' prior counsel rendered ineffective assistance to him in that hearing. That alleged ineffective assistance consisted of: (i) only meeting once with Mr. Hawkins, shortly before the hearing; (ii) failing to call witnesses or to otherwise investigate and address the "fishtailing" issue; (iii) failing to ask unspecified

questions on cross-examination, ostensibly waiting to do so on "re-cross"; and (iv) filing a Notice of Disposition without Mr. Hawkins' consent. The Court finds that none of these allegations, individually or in concert, demonstrate a degree of ineffectiveness that would warrant revisiting the suppression hearing.

As explained in *Strickland v. Washington*, 466 U.S. 668 (1984), the Court presumes counsel's performance was effective, and the burden is on Mr. Hawkins to: (i) identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment; and (ii) demonstrate that those acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 689-90. Moreover, he must demonstrate that, but for counsel's errors, there is a "reasonable probability" that the result of the suppression hearing would have been different. *Id.* at 694.

The Court finds that none of the alleged failures by prior counsel, individually or in concert, give rise to a colorable assertion of ineffective assistance. The question of whether counsel was adequately prepared for the hearing cannot be assessed based simply upon the number of times counsel met with Mr. Hawkins, or whether counsel asked certain (unspecified) questions that Mr. Hawkins believes should have been asked on cross-examination. Questions of whether counsel was adequately prepared or engaged in appropriate strategy are among those upon which the Court is particularly deferential to counsel. *Id.* at 690-91. Mr. Hawkins' counsel might very well have concluded that repetitive preparations for the suppression hearing were unnecessary, particularly insofar as the issues were factually-simple and clearly defined, and that only one witness for the Government was involved. Counsel might also have reasonably concluded that extensive presentation on the "fishtailing" issue through additional witnesses

15

would have been unnecessarily redundant and cumulative of Mr. Hawkins himself explaining why his car could not have behaved as described.   Mr. Hawkins does not address what additional questions he believes counsel should have asked during cross-examination, much less show that it was unreasonable for counsel to refuse to ask such questions and that the responses to those questions had a reasonable probability of altering the result of the hearing.  Finally, the fact that counsel may have filed a Notice of Disposition without consulting with Mr. Hawkins is of no significance to the question of whether counsel's performance at the suppression hearing was reasonable.

Indeed, the Court believes that Mr. Hawkins' prior counsel provided as vigorous a defense as could reasonably be expected under the circumstances.  Given the relatively light burden on the Government to justify traffic stops and pat-down searches, Mr. Hawkins' counsel was facing long odds in prevailing on the suppression motion from the very beginning.  Counsel attacked, as best they could, Sergeant Noeller's observations about Mr. Hawkins' driving and his justifications for both the traffic stop and pat-down search.  The mere fact that counsel was unable to persuade the Court to disbelieve Sergeant Noeller's testimony is not proof of counsel's ineffectiveness, and Mr. Hawkins points to little that counsel could have done differently. Accordingly, the Court finds nothing in Mr. Hawkins' submissions that presents a colorable assertion that he received ineffective assistance of counsel during the suppression hearing.

### E.  Remaining contentions

The Court need not address Mr. Hawkins' remaining arguments with particular specificity.  The Court has examined those arguments and finds them to be either factually or legally mistaken, or both.

## **CONCLUSION**

For the foregoing reasons, Mr. Hawkins' Motion to Supplement/Motion for Reconsideration **(# 40)** is **GRANTED IN PART**, insofar as the Court has reconsidered whether the result of the suppression hearing might have been different in light of the additional evidence tendered by Mr. Hawkins, and **DENIED IN PART**, insofar as the Court finds that, even upon such reconsideration, the motion to suppress would have been denied despite the additional evidence and arguments offered. Mr. Hawkins' Motion Requesting Evidentiary Hearing **(# 57)** is **DENIED**. Mr. Hawkins' Motion for Clarification **(# 67)** is **DENIED AS MOOT**.

The Court observes that there are no remaining matters that remain to be resolved pending trial in this matter. Accordingly, by 5:00 pm on Monday, April 9, 2012, counsel shall jointly contact chambers to set a date for a pretrial conference and jury trial in this matter.

Dated this 5th day of April, 2012

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
United States District Judge